USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   July 3, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
:
TRIUMPH CONSTRUCTION CORP.,                            :
:
                                   Petitioner,         :        12 Civ. 8297 (KPF)
:
                         v.                            :        OPINION AND ORDER
:
THE NEW YORK CITY COUNCIL OF                           :
CARPENTERS PENSION FUND, *et al.*,                     :
:
                                   Respondents.        :
:
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

       This is the latest round in a long-running dispute between Triumph

Construction Corporation, here the petitioner in an effort to stay permanently

an arbitration, and the New York City District Council of Carpenters (the

"Union") and its associated fringe benefit funds (the "Funds") (collectively,

"Respondents"), here seeking to enforce via arbitration their claimed right to

conduct an audit of Triumph's records.  Pending before the Court are the

parties' dueling motions for summary judgment as to whether that arbitration

should proceed.  For the reasons set forth below, Respondents' motion is

granted and Petitioner's motion is denied.

# BACKGROUND[1]

## A.   Factual Background

### 1.   The Relationship Between the Parties

Triumph is a heavy construction contractor.  (Pet. 56.1(a) ¶ 3; Resp. 56.1(b) ¶ 3; Resp. 56.1(a) ¶ 7; Pet. 56.1(b) ¶ 7).  The Union is composed of a number of local labor unions.  (Pet. 56.1(a) ¶ 2; Resp. 56.1(b) ¶ 2).  The Funds administer and provide benefits to members of those unions.  (*Id.*).

Triumph has had a relationship with Respondents since 2004, when it executed a collective bargaining agreement ("CBA") covering dockbuilders[2] and began making contributions to the Funds in connection with employing laborers who belonged to the Union.  (Resp. 56.1(a) ¶ 12; Pet. 56.1(b) ¶ 12; Pet.

---

[1]     Because each side has filed a motion for summary judgment, each side has submitted its own statement of undisputed facts pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York. The facts set forth in this Opinion are drawn from Triumph's Statement of Undisputed Facts ("Pet. 56.1(a)"), Respondents' responsive Rule 56.1 statement ("Resp. 56.1(b)"), Respondents' Statement of Undisputed Facts ("Resp. 56.1(a)"), and Triumph's responsive Rule 56.1 statement ("Pet. 56.1(b)").

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For convenience, the briefs submitted in connection with Petitioner's motion for summary judgment are identified as "Pet. Br.," "Resp. Opp.," and "Pet. Reply"; while those submitted in connection with Respondents' motion for summary judgment are identified as "Resp. Br.," "Pet. Opp.," and "Resp. Reply."  Depositions and declarations are referred to using the convention "[Name] Dep." and "[Name] Decl."

[2]     Workers of this type are not at issue in this dispute.

56.1(a) ¶ 5; Resp. 56.1(b) ¶ 5).  It is undisputed that since that time Triumph has employed and made payments on behalf of Union members on a regular basis.  (Pet. 56.1(a) ¶ 5; Resp. 56.1(b) ¶ 5).

What agreements, if any, existed between the parties over the length of their relationship is a hard-fought issue.  Respondents contend that in February 2008, they presented Triumph with a CBA covering the term 2002-2006 (the "2006 CBA"), and that Triumph executed that agreement and agreed to be bound by it retroactively.  (Resp. 56.1(a) ¶ 18).  Around the same time, Respondents allege that Triumph executed a compliance agreement (the "First Interim Agreement" or "FIA") in which it agreed to be bound by the terms of that agreement until the finalization of an agreement between the Union and the employer association whose members do work similar to that done by Triumph (a "Successor Agreement").  (*Id.* at ¶ 16).

It is undisputed that Triumph does not belong to any such employer association.  Respondents insist that the General Contractors Association (the "GCA") is the employer association that does work similar to that done by Triumph for the purposes of the successor-agreement provision of the First Interim Agreement.  (Resp. 56.1(a) ¶ 17).  In this regard, the Union negotiated an agreement with the GCA covering the term 2006-2011 (the "2011 GCA CBA").  Respondents argue that this agreement invoked the successor-agreement provision of the First Interim Agreement and, in consequence, bound Triumph.  (*Id.*).

3

Respondents further submit that in June 2012, Triumph executed another compliance agreement (the "Second Interim Agreement" or "SIA") continuing the effect of its preceding CBA with the Union — in Respondents' view, the 2011 GCA CBA — until, once again, the Union negotiated a new agreement with the employer association whose members do work similar to that done by Triumph, at which time this new successor agreement would bind Triumph.  (Resp. 56.1(a) ¶ 33).  The Union subsequently negotiated a new agreement with the GCA covering the term 2011-2017 (the "2017 GCA CBA"). Unsurprisingly, Respondents argue that, by virtue of its execution of the Second Interim Agreement, Triumph has assented to and is currently bound by the terms of the 2017 GCA CBA.  (*Id.* at ¶ 34).

As relevant here, the terms of these agreements are identical.  In addition to requiring Triumph to obey specific rules about payments, work assignments, and grievance procedures, they also each contain an agreement to arbitrate disputes regarding benefit payments to the Funds.  (*See, e.g.*, 2006 CBA 31-32).  They also each specifically incorporate by reference and bind signatory employers to the terms of the agreements that govern the operations of the Funds (the "Trust Agreements").  The Trust Agreements, in turn, require employers to submit to audits by the Funds of their records and financial documents.  (Trust Agreements 6).  The Trust Agreements also contain an arbitration provision requiring the parties to arbitrate disputes regarding the collection and inspection of documents, including the audit requirements;

notably, the arbitration provision explicitly excludes disputes over contributions to the Funds from the arbitration process.  (*Id.* at 24).

The Trust Agreements also empower the Trustees of the Funds to adopt regulations necessary to pursue the purposes of the Trust Agreements.  (Trust Agreements 19).  Pursuant to this authority, the Trustees have adopted a collection policy (the "Collection Policy") that permits the Funds to collect attorneys' fees and costs for actions necessary to enforce their right to conduct an audit of employers' records.  The Trustees have also adopted a procedure to be used in estimating the possible delinquency in contributions of employers who refuse to permit the Funds to conduct audits (the "Estimation Policy"). This policy estimates delinquent contributions by determining the highest number of average hours reported by the employer for any week throughout the period for which the Funds seek to conduct an audit, and then applying that number of hours to every week throughout the audit period.

Triumph resists almost every element of the relationship Respondents contend exists between the parties.  To begin with, Triumph insists that it never received or executed the 2006 CBA.  (Pet. 56.1(a) ¶ 15).  Instead, it claims to have received only a two-page document containing what is apparently the first page of the 2006 CBA followed by a signature page.  (*Id.* at ¶ 19).  This document, termed by Triumph the "2008 Agreement," is the only document Triumph acknowledges ever receiving or executing in 2008.  (*Id.* at ¶ 18). Because this two-page document contains no effective terms, Triumph argues that it was never bound by any underlying CBA with the Union.  (*Id.* at ¶ 20).

5

Further, Triumph claims never to have received or signed the First Interim
Agreement (*id.* at ¶ 21); the signature on that document, Triumph claims, is
not the signature of Triumph's principal, Carlos Cuzzi, nor is it the signature of
any individual authorized to sign on his behalf (Cuzzi Decl. ¶ 10).  Because
Triumph never received or executed the 2006 CBA, it argues here, it had no
preexisting CBA with the Union whose terms the First Interim Agreement could
have extended.  (Pet. 56.1(a) ¶ 22).

Additionally, Triumph refuses to accept that the GCA is the employer
association whose work is similar to its own.  It contends that Respondents
have failed to explain what association invokes the successor-agreement
provision of the First Interim Agreement, and it thus denies that the 2011 GCA
CBA has any effect on it.  (Pet. 56.1(a) ¶¶ 23, 25, 28).  Though Triumph does
not similarly allege that the signature on the Second Interim Agreement is also
a forgery, it similarly denies that that agreement imposed any obligations on it:
because it had no CBA in place with the Union at the time its principal signed
the Second Interim Agreement, no obligations existed for that agreement to
extend.  (*Id.* at ¶¶ 29, 32).  Triumph further argues that Respondents have
failed to demonstrate what subsequent CBA invoked the successor-agreement
provisions of the Second Interim Agreement.  (*Id.* at ¶ 31).  In short, Triumph's
position is that at no time in the last decade, with respect to the work at issue
here, has it ever been subject to a CBA with the Union, any attendant Trust
Agreements, or any regulations promulgated thereunder.

### 2.    The Present Dispute

In May 2010, the Funds conducted an audit of Triumph's records; this was the second such audit the Funds had conducted.  (Resp. 56.1(a) ¶¶ 25, 43; Pet. 56.1(b) ¶¶ 25, 43).  Respondents claim that during this audit, a Triumph employee showed the auditor records of affiliated companies, previously unknown to the Funds, that performed similar work to Triumph without hiring Union employees, but then refused to permit the auditor to examine these records further.  (Resp. 56.1(a) ¶ 44).  Triumph, unsurprisingly, denies that any such episode took place.  (Pet. 56.1(a) ¶ 44).  This incident is the basis for the years of conflict that have ensued between the parties.  Respondents wish to finish the audit; Triumph refuses.

Respondents, confronted with Triumph's resistance, filed a notice of intent to arbitrate the audit issue in August 2010.  (Pet. 56.1(a) ¶ 33; Resp. 56.1(b) ¶ 33).  Triumph then filed suit in New York State Supreme Court seeking to stay the arbitration; Respondents removed the state action to federal court, after which the parties voluntarily dismissed it.  (Pet. 56.1(a) ¶¶ 34-36; Resp. 56.1(b) ¶¶ 34-36).  Respondents initiated a second arbitration in February 2011 that they subsequently withdrew.  (Pet. 56.1(a) ¶¶ 37-39; Resp. 56.1(b) ¶¶ 37-39).  Respondents initiated a third arbitration in August 2011; Triumph again filed a state court action seeking to stay this arbitration.  (Pet. 56.1(a) ¶¶ 40-42; Resp. 56.1(b) ¶¶ 40-42).  Respondents, later in August 2011, filed an action in federal court seeking to compel the audit via court order.  (Pet. 56.1(a) ¶ 49; Resp. 56.1(b) ¶ 49; Gardner Decl. Ex. Q).  After this prior

7

federal action was filed, the parties entered into a stipulation of discontinuance (the "Stipulation") with respect to the state court action.  (Pet. 56.1(a) ¶ 45; Resp. 56.1(b) ¶ 45).  The prior federal action was ultimately dismissed because the court there found that the Trust Agreements forced the Funds to arbitrate their claim to conduct an audit of Triumph's records — and, by extension, precluded them from seeking that relief in court.  (Pet. 56.1(a) ¶ 52; Resp. 56.1(b) ¶ 52).

Thereafter, pursuant to the Estimation Policy, the Funds claim they notified Triumph that it would be liable for an estimated delinquency unless Triumph submitted to the long-sought audit of its records.  (Resp. 56.1(a) ¶ 50).  Triumph did not do so.  (Resp. 56.1(a) ¶ 51; Pet. 56.1(b) ¶ 51).

**B.    The Instant Litigation**

In September 2012, Respondents filed the notice of intent to arbitrate at issue in this action.  (Resp. 56.1(a) ¶ 51; Pet. 56.1(b) ¶ 51).  Triumph filed a state court action to stay the arbitration and Respondents removed that action here.  (Resp. 56.1(a) ¶ 52; Pet. 56.1(b) ¶ 52).  After settlement discussions failed, the parties cross-moved for summary judgment on November 19, 2013. (Dkt. #19, 28).  Each opposed the other's motion (Dkt. #33, 36), and both motions were fully briefed on January 14, 2014.  (Dkt. #40, 42).

## DISCUSSION

### A.    Applicable Law

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## B.    Application

The parties have fought a number of sequential legal questions.  Triumph loses each.  Triumph is bound by the terms of the relevant CBAs that oblige it to submit to this arbitration, whether by its admitted actions in executing the CBAs or by its conduct evincing its intention to adopt the obligations the CBAs impose.  The question of whether Respondents are nonetheless precluded from arbitrating, either because of the purported preclusive effect of the Stipulation

or because of an alleged failure to comply with contractual conditions precedent to arbitration, is thought-provoking, but is properly reserved for decision by the arbitrator and not by the Court.  Lastly, in light of the Court's decisions, attorneys' fees for this action are granted to Respondents as detailed further in this Opinion.

### 1.   There Was an Agreement

#### a.   Triumph Has Admitted to Signing the 2006 CBA and the First Interim Agreement

Triumph devotes a significant portion of its briefing to the claim that it never entered into any meaningful agreement with the Union.  It never received or signed the 2006 CBA, it contends; what Respondents identify as proof of Triumph's assent to that agreement is actually a separate document entirely, the "2008 Agreement," only two pages long and devoid of any terms.  Triumph insists that it received this two-page 2008 Agreement as an independent document, and signed and returned this document to the Union without reference to any CBA.  Further, according to Triumph, what the Respondents identify as the First Interim Agreement — which purported to bind Triumph to its lapsed CBA until a new industry-wide agreement was negotiated with an employer association —was never received by Triumph.  The signature on that document is a forgery, and "even a cursory comparison" of the signature with signatures on other documents demonstrates that it was forged.  (Pet. Br. 7). These positions, remarkable if true, would certainly suffice to create material issues of fact with respect to the status of these agreements.

11

Lamentably for Triumph, it may not maintain such factual claims: Triumph admitted, in its Petition to stay the arbitration at issue here, both that it "executed [a] collective bargaining agreement[] with the [Union] concerning the Timbermen's Local 1536," and that "[a]fter the expiration of [that agreement], an interim compliance agreement was entered into, purporting to continue to bind Triumph" to its lapsed CBA.  (Petition ¶¶ 8-9).  "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding."  *Bellefonte Re Ins. Co.* v. *Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985); *see also Clarke* v. *JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400 (CM) (DCF), 2010 WL 1379778, at *14 (S.D.N.Y. Mar. 26, 2010) (collecting cases).  This rule holds especially true where the assertion is "made by one party concerning matters peculiarly within its knowledge or control," as here, where Triumph made sworn statements in the Petition regarding the agreements into which it entered with the Union.  *Banks* v. *Yokemick*, 214 F. Supp. 2d 401, 406 (S.D.N.Y. 2002).  It is certainly true that "[t]rial judges are given broad discretion to relieve the parties from the consequences of judicial admissions in the appropriate circumstances."  *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 379 F. Supp. 2d 348, 371 (S.D.N.Y. 2005).  "[A] District Court, convinced that an honest mistake had been made, the original allegation was untrue and that justice required relief … may, in its discretion, relieve the party of its otherwise binding consequence."  *Coral* v. *Gonse*, 330 F.2d 997, 999 n.1 (4th Cir. 1964) (citing 9 WIGMORE ON EVIDENCE, § 2588 *et seq.*).  But there is no indication here

12

that such a mistake was made.  To the contrary, though Respondents opposed

Triumph's motion for summary judgment in part by relying on the factual

claims made in Triumph's petition (Resp. Opp. 12-14), Triumph simply ignored

this argument and made no response at all, much less requested relief from the

Court for an inadvertent admission in the Petition.[3]

Had Triumph elected to respond to this argument, it might have said

something along the following lines: while those statements may appear to be

admissions, they are sufficiently ambiguous that they should not be held to

foreclose argument on the question of what agreements existed between the

parties.  After all, even Respondents accept that Triumph assented to the 2006

CBA no earlier than February 27, 2008, when Triumph signed what it now

contends is a separate, unrelated 2008 Agreement and what Respondents

contend is an effectuating excerpt of the 2006 CBA itself.  (Resp. 56.1(a) ¶ 18;

Pet. 56.1(a) ¶ 18).  Yet the Petition indicates that the 2006 CBA was "actually

executed on July 1, 2006," a date neither party now suggests could be the true

signature date of the agreement in question.  (Petition ¶ 8 n.3).  Fair enough.

The fact remains that the Petition unambiguously and repeatedly avers that

Triumph executed the 2006 CBA as well as the First Interim Agreement,

contrary to its position now that it never received or signed either of those

---

[3]     Notably, Triumph relies on the Petition in its reply brief to argue that Respondents were
adequately on notice of arguments first made there and repeated in its motion for
summary judgment here.  (Pet. Reply 2).  Obviously, Triumph was aware that its
Petition exists and has bearing on these motions.  Its failure nonetheless to confront
Respondents' arguments regarding the Petition's preclusive effect on Triumph's central
arguments here is all the more confounding in consequence.

documents.  (Petition ¶ 42 ("[T]he CBA between Triumph and the [Union] expired on June 30, 2006...."), ¶ 43 ("[O]nly in signing the interim agreement, in which Triumph purported to be bound...."), ¶ 45 ("By entering into the interim agreement, Triumph agreed....")).  These repeated admissions in the Petition preclude Triumph from arguing now that it never entered into the 2006 CBA or that it never executed the First Interim Agreement.[4]

There can be no question that the Union adopted a remarkably erratic approach to its affairs.  Triumph apparently performed significant work appropriate for a Timbermen's CBA for several years without ever being asked to sign an agreement covering such work.  The Union then presented Triumph in 2008 with an agreement expiring on June 30, 2006, asked Triumph to execute that 2006 CBA, and separately asked Triumph to execute a separate interim agreement with an effective date of July 1, 2006, extending the effect of the 2006 CBA to some future date at which time Triumph would assume the obligations of a contract negotiated with a separate entity with retroactive effect to June 30, 2006.  No one would suggest the Union followed an orderly procedure regarding its agreements with Triumph.  But the oddity of this procedure is irrelevant.  Triumph's acknowledged assent to these agreements is all that matters.

Thus, Triumph confessedly was subject to a valid CBA bearing an expiration date of June 30, 2006, the effect of which was extended by its prior

---

[4]    Even if these admissions in its Petition were not enough, as discussed below Triumph's conduct also binds it to these agreements as well.

execution of the First Interim Agreement until the finalization of a subsequently negotiated Successor Agreement with the appropriate employer association whose terms would then bind Triumph as well.[5]  By the same token, assuming a Successor Agreement exists that appropriately invoked the relevant provisions of the First Interim Agreement, the Second Interim Agreement would have in turn prolonged the effect of that Successor Agreement until a subsequently negotiated agreement between the Union and the appropriate employer association took its place and invoked the Second Interim Agreement's successor provisions.  *Compare Moglia* v. *Geoghegan*, 403 F.2d 110, 114-15 (2d Cir. 1968) (observing that no CBA ever existed between the union and the employer); *Panek* v. *Cimato Bros. Const., Inc.*, No. 02 Civ. 333 (RJA), 2007 WL 3033948, at *1 (W.D.N.Y. Oct. 15, 2007) (noting that the employer "never signed the agreements" with the union).

Triumph separately seeks to attack the First and Second Interim Agreements' validity as "textbook illusory and unenforceable agreements" because they are insufficiently definite.  (Pet. Opp. 15).  This argument is untethered from the actual issues in this case.  The interim agreements are not contracts for the sale of goods.  They are components of a long-term relationship between an employer and a labor union, and subject to particular rules of interpretation that have developed around collective bargaining agreements.  As the Supreme Court explained long ago, "a collective bargaining

---

[5]    The separate issue of identifying the Successor Agreement is addressed in the following subsection.

agreement is not an ordinary contract," nor is it "in any real sense the simple product of a consensual relationship." *John Wiley & Sons, Inc.* v. *Livingston*, 376 U.S. 543, 550 (1964). The cases and principles on which Triumph seeks to rely "do not concern arbitration clauses contained in CBAs, or the compelling federal labor policy that favors the enforcement of such provisions...." *Seabury Const. Corp.* v. *Dist. Council of New York & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 461 F. Supp. 2d 193, 196 (S.D.N.Y. 2006).

Respondents, in contrast, identify two separate decisions from this District in which similar or identical interim agreements were held to bind the signatory employer to the obligations of the preexisting and subsequently negotiated CBAs. In *New York Dist. Council of Carpenters Pension Fund* v. *KW Const., Inc.*, No. 07 Civ. 8008 (RJS), 2008 WL 2115225 (S.D.N.Y. May 16, 2008), the employer had signed a previous CBA with the Union and, after its lapse, had signed an interim agreement with precisely the same wording as here regarding the subsequent negotiation of a successor agreement with an employer association. *Id.* at *2. The court in *KW Construction* concluded that the interim agreement bound the employer to the successor agreement eventually negotiated between the union and the appropriate employer association. *Id.* at *3.

Just the same was true in the *Seabury Construction Corp.* decision cited above. There, the court concluded that "[b]y signing the Interim Agreement, [the employer] agreed to be bound under the successor agreement," including

16

its arbitration provisions.  461 F. Supp. 2d at 196.  Judge Sweet went on to

explain:

> The Interim Agreement must be viewed in light of the common practices of the construction trades industry. The construction industry typically engages in what is known as pattern bargaining.... In each round of negotiations, one [employer] and [the union] would reach an agreement which would set the pattern for the ... industry, and the other companies would then adopt the same provisions as a means of equalizing labor costs. This pattern bargaining resulted in the same wages and benefits and working conditions for all employees and retirees....  An agreement to be bound by the results of multi-employer pattern bargaining does not bind a party to a set of contractual obligations that he never knowingly assumed.  A contractor ... that makes such an agreement has sufficient knowledge of obligations it has assumed, because it has obligated itself to conform to the industry standards....

*Id.* at 197 (internal quotation marks and citations omitted).  Triumph cannot

argue that this practice, to which it twice assented, amounted to some kind of

bewildering surprise or bait-and-switch on the part of the Union.  Triumph was

bound by the 2006 CBA because, as it confessed, it executed that CBA in 2008

as well as the First Interim Agreement, the latter of which provided for the

ongoing validity of the CBA from the effective date of July 1, 2006, until a

subsequent Successor Agreement took effect.

### b.     The GCA Agreement Is the Successor Agreement

The First Interim Agreement gives ongoing effect to the 2006 CBA until

"the Union concludes negotiations with the Association(s), whose members

perform work similar to the work performed by" Triumph, at which time

17

Triumph would become bound by the terms of that newly negotiated Successor Agreement.  (FIA 1).

As noted, Respondents claim that the GCA is the association whose work is most similar to the "type of heavy construction work performed by Triumph." (Resp. 56.1(a) ¶ 17).  It relies for this claim on five pieces of evidence.  The first is a citation to Cuzzi's deposition testimony that Triumph performs "heavy highway construction." (Cuzzi Dep. 7:19-20).  The second is a citation to Triumph's own Petition, where Triumph refers to itself as a "heavy construction contractor." (Petition ¶ 7).  The third is a citation to the GCA Timbermen's CBA, indicating that the GCA agreement "is the uniform agreement for the Heavy Construction Industry." (2006-2011 GCA Timbermen's CBA 2).  The fourth is a citation to the declaration of Joseph Geiger, a business agent for the Union, in which Geiger avers that Triumph performs heavy construction industry work and that the terms of the GCA Timbermen's CBA and the Independent Timbermen's CBA are "substantially similar." (Geiger Decl. ¶¶ 4-5).  The fifth is a citation to the declaration of Carl Zanchelli, also a business agent for the Union, swearing that Triumph performs heavy construction industry work.  (Zanchelli Decl. ¶¶ 3-4).

Triumph denies this claim, relying on two pieces of evidence.  The first is a citation to a paragraph of Cuzzi's declaration in which he swore that Triumph is not a member of any association that has bargaining authority regarding union contracts and so was not a party to any agreement between the Union and an employer association.  (Cuzzi Decl. ¶ 14).  This does Triumph no good;

Respondents' position is that Triumph bound itself to an agreement between the Union and an *appropriate* employer association, not an association to which Triumph belonged or which held Triumph's proxy for union negotiations. The second, and somewhat more successful, basis for Triumph's denial is a citation to two pages of the deposition of Luke Powers, the director of contractor accounting for the Funds.  On the first of the cited pages, Powers indicates his belief that Triumph's work would "probably" be closest to the work done by members of the GCA.  (Powers Dep. 32:18-19).  On the second, Powers indicated that he did not know "specifically" which association did work closest to Triumph's work, but that "the GCA covers the heavy construction." (*Id.* at 78:16-22).  These cited sections from the testimony of Powers, the sole deponent on behalf of Respondents, do indicate a lack of clarity even on the part of Respondents as to which employer association had the closest relationship to Triumph's work.  But this thin reed is not enough for Triumph to substantiate its argument: even though unsure and avowing his lack of expertise, Powers nonetheless expressed his belief that the GCA was "probably" the appropriate association for Triumph's work.  (*Id.* at 32:18-19).

In its Petition, Triumph noted that the GCA is "seemingly the association whose members perform work similar to the work performed by Triumph." (Petition ¶ 11 (internal quotation marks omitted)).  This concession does not aid Triumph in its arguments before this Court.  At the same time, however, and unlike its admissions that it executed the 2006 CBA and the First Interim Agreement, Triumph has not admitted in its Petition that it was bound by any

19

GCA agreement.[6]  Nor did the Petition anywhere indicate that Triumph accepted being bound by any agreement between the Union and the GCA.

Considering the record in its totality, the Court concludes that Respondents have shown that the 2011 and 2017 GCA Agreements invoked, respectively, the successor-agreement provisions of the First and Second Interim Agreements.  Just as in *KW Construction*, Respondents "plausibly assert, and offer sufficient evidence in support," that Triumph does heavy construction work and that the General Contractors Association is the employer association whose work is similar Triumph's.  2008 WL 2115225, at *3.  Most significant in this respect is this: the 2006 CBA — an agreement Triumph admitted in its Petition that it signed — refers to itself as "the uniform agreement for the Heavy Construction Industry."  (2006 CBA 2)  The 2011 GCA CBA, an agreement Triumph referred to in its Petition as "seemingly" the document that invoked the First Interim Agreement's successor-agreement

---

6       Separately, Triumph argues that Respondents may not rely on the GCA agreements because they failed to produce those agreements during discovery.  (Pet. Br. 14-15).  Triumph elsewhere argued that "[t]he GCA Agreement was never provided to Triumph, and Triumph was entirely unaware of its existence, much less the terms of that agreement, until the instant lawsuit." (*Id.* at 9).  Yet Triumph was certainly on notice that the GCA agreements were at play in this dispute, and indisputably had access to the terms of those agreements: Triumph attached the 2011 GCA Agreement as an exhibit to its own Petition.  Nor were Respondents so unforthcoming during discovery regarding the agreements that they argued bound Triumph that Respondents should be "estopped," as Triumph contends, from relying on the GCA agreements.  (*Id.* at 13-14).  Respondents have consistently made clear throughout this litigation their position that Triumph had assented to the 2006 CBA, the First Interim Agreement, and the Second Interim Agreement.  Just as the 2006 CBA incorporates by reference and thus subjects Triumph to the terms of the Trust Agreements, so too do the First and Second Interim Agreements incorporate by reference and subject Triumph to the terms of a Successor Agreement between the Union and the appropriate employer association.  Triumph knew which association that was when it referred in its Petition to the GCA as "seemingly" the appropriate association.  (Pet ¶ 11).

provisions (Petition ¶ 11), uses precisely the same language.  In other words, the 2006 CBA identifies itself using the exact wording later employed in an agreement negotiated between the Union and the GCA designed to cover the work of all heavy construction contractors.  And Triumph, both in its Petition and via the deposition of its principal Cuzzi, self-identifies as a "heavy construction contractor."  (*Id.* at ¶ 7; *see also* Cuzzi Dep. 7:19-20).

Nowhere does Triumph offer any evidence rebutting the clear relationship between Triumph, heavy construction contracting, and the GCA.  Cuzzi's declaration, notably, does not contend that some other employer association has a closer relationship to Triumph's work.  He avers only that Triumph is not a member of any such association and has not deputized any association to negotiate collective bargaining agreements on its behalf; he then leaps from these facts to the legal conclusion that Triumph necessarily "was not, and would not have been, a party to any" agreement negotiated by such an association.  (Cuzzi Decl. ¶ 14).  Cuzzi's sworn testimony is simply irrelevant: the question is which association has the appropriate proximity to Triumph's work, not whether Triumph belonged to any association.  Even Powers' testimony, to which Triumph points as a sign that the Union itself was unaware of which association bore the necessary resemblance to Triumph's work, serves more to bolster the Respondents' position than anything else.  Powers testified, while acknowledging that he was "not the authority" on the topic of which association's work was similar to Triumph's, that he nonetheless believed that the GCA was the appropriate employer association.  (Powers

Dep. 78:16-22).  And given that the 2006 CBA Triumph signed with the Union was itself "the uniform agreement for the Heavy Construction Industry" (2006 CBA 2), Triumph cannot plausibly argue that it was unaware that an agreement negotiated between the Union and the GCA, the association of heavy construction contractors, would provide the basis for Triumph's own relationship with the Union.

Only in the declaration of its counsel in opposition to Respondent's motion does Triumph make any effort to engage meaningfully with the substance of this dispute: is there some other association arguably more similar to Triumph than the GCA?  Triumph's counsel suggests that, "[w]hile some of the work engaged in by Triumph may be of the same type [as that performed by GCA members], this was not established and Triumph is engage[d] in various types of construction and other of its work may be more closely covered by a different association." (Gardner Decl. ¶ 12.c).  It is curious that this claim was introduced via an attorney's declaration, rather than, for example, a responsive statement pursuant to Local Rule 56.1(b) or, even better, in the declaration of Triumph's principal.  But this procedural oddity aside, Triumph's counsel's conclusory assertion cannot disturb the substantial evidence discussed above demonstrating that members of the GCA do work similar to Triumph's.  It is supported by a single citation to the Powers deposition, but, as discussed just above, Powers' testimony tends much more to support than to undermine Respondents on this score.

22

In short, Triumph has introduced no evidence at all to rebut, and Respondents have introduced much to demonstrate, that the GCA is the association whose agreement triggered the successor-agreement provisions of the First Interim Agreement.  And because Triumph was subject to the 2011 GCA CBA at the time it — undisputedly — signed the Second Interim Agreement, the 2011 GCA CBA remained in force pursuant to the Second Interim Agreement until the GCA executed the 2017 GCA CBA.  The 2017 GCA CBA, in turn, bound Triumph, just as the prior GCA agreement had. Triumph's assent to these many agreements has left it unambiguously subject to a CBA with the Union since it executed the 2006 CBA in February 2008.  It remains subject to a CBA today.

### 2.    Triumph's Conduct Bound It to the Same Obligations

Respondents argue, in the alternative, that Triumph remains bound to the obligations articulated in the relevant CBAs, even if it never signed them, because it willingly acted in accordance with those obligations over many years.  Respondents are right.

Triumph acknowledges that it has employed between four and eight carpenters at a time throughout the last ten years.  (Resp. 56.1(a) ¶ 10; Pet. 56.1(b) ¶ 10; Cuzzi Decl. ¶ 3).  Triumph also acknowledges that it paid these employees in accordance with the rate sheets for wages and fringe benefits provided by the Union.  (Resp. 56.1(a) ¶ 13; Pet. 56.1(b) ¶ 13 & n.1).  Triumph cannot deny, though it seeks to do so, that it has participated in grievance

meetings with the Union.  (Resp. 56.1(a) ¶ 20; Pet. 56.1(b) ¶ 20; Geiger Decl.

¶ 6).[7]

Triumph fails to rebut Respondents' well-supported assertion that

Triumph has settled grievances by making payments to Union members and

making contributions to the Funds.  (Resp. 56.1(a) ¶ 23; Pet. 56.1(b) ¶ 23;

Geiger Decl. ¶ 7; Powers Decl. Ex. J).[8]  Triumph admits that it submitted to an

---

[7]   Respondents assert in their Rule 56.1 statement that "Triumph has participated in
several grievance meetings with the Union from 2005 through 2013 pursuant to the
Timbermen CBAs."  (Resp. 56.1(a) ¶ 20).  Triumph contends, in its responsive Local
Rule 56.1 statement, that this assertion is "not supported by the materials cited."  (Pet.
56.1(b) ¶ 20).  Respondents cite the declaration of Joseph Geiger and the deposition of
Carlos Cuzzi.  Of note here, Geiger avers that

> [o]n multiple occasions [Geiger has] filed grievances against
> Triumph for failing to comply with the provisions of the collective
> bargaining agreement....  On at least two occasions Triumph's
> principal, Carlo Cuzzi, has attended formal grievance meetings
> concerning these grievances at the Union's office at which [Geiger]
> was present and the Grievance Committee Chairman was also
> present.

(Geiger Decl. ¶ 6).  The same is true of the deposition testimony of Triumph's principal.
Cuzzi testified the Union filed a grievance against Triumph on multiple occasions.
(Cuzzi Dep. 14:19-25).  He also testified that he personally went to the Union hall to
participate in a grievance meeting three or four times, and at some of those meetings
resolved the grievance.  (*Id.* at 15:6-16:16).

Triumph does not explain how this testimony does not support Respondents' Rule 56.1
assertion.  It is true that neither account specifically identifies the years in which these
meetings took place, and so the 2005-2013 time frame Respondents claim may not be
fully supported; it is also true that neither witness expressly swears that the grievances
were conducted according to the procedures provided by the CBAs at issue.  The fact
remains that Triumph's principal, according to the unrefuted testimony of both a Union
official and Cuzzi himself, has gone to the Union's headquarters to participate in a
grievance meeting with Union officials on more than one occasion.  This fact is the
substance of Respondents' claim, and the evidence supports it.

[8]   Triumph offers two responses.  The first is that it has settled grievances purely for
economic reasons; the second is that it has refused to attend grievance meetings
addressing grievances regarding "work rules alleged in a CBA," as opposed to grievances
limited to owed wages and contributions.  (Resp. 56.1(b) ¶ 23).  Triumph cites no
evidence for this denial.  This absence of evidence is noteworthy, as Triumph's principal
both testified at a deposition and submitted a declaration, giving him ample opportunity
to explain exactly what Triumph did and did not do with respect to its relations with the
Union.  Regardless, by failing to support its denial with any citations, Triumph has
admitted Respondents' assertion.  *See* Local Rule 56.1(d).

audit of its books and records by the Funds; though it denies it did so "in accordance with the requirements of the" CBA and Trust Agreements, it is uncontested that Triumph permitted the auditors of the Union's associated benefit funds to examine its private financial records in depth.  (Resp. 56.1(a) ¶ 25; Pet. 56.1(b) ¶ 25).  Triumph admits that it posted a surety bond on April 24, 2009, in favor of the Union and the Funds, though it denies it did so pursuant to any obligation under a collective bargaining agreement.  (Resp. 56.1(a) ¶ 28; Pet. 56.1(b) ¶ 28).  This bond explains on its face that Triumph was required "to furnish a bond of indemnity guaranteeing payments of [Funds] payments [that Triumph] is obligated to pay pursuant to the terms and conditions of the Collective Bargaining Agreement with the [Union], and which Agreement, is effective the 24th of April, 2009."  (Powers Decl. Ex. I).[9]  Nor does Triumph deny that it posted another, identically worded bond on April 24, 2013, well after the commencement of this litigation.  (Resp. 56.1(a) ¶ 29; Pet. 56.1(b) ¶ 29).  And Triumph submitted to a second audit of its books in 2010 — the incident giving rise to this long, shambolic dispute.  From these uncontested or admitted facts, Respondents argue that Triumph's conduct

---

[9]     Triumph's responsive Rule 56.1 statement denies that the quoted language from the bond supports Respondents' assertion that "[t]he surety bonds state that Triumph posted the bonds to guarantee payment of amounts owed to the Funds pursuant to Triumph's collective bargaining agreement with the Union that was in effect on the days on which Triumph posted each bond, and explicitly incorporate the collective bargaining agreement into the surety bonds."  (Resp. 56.1(a) ¶ 30; Pet. 56.1(b) ¶ 30).  The quoted language from the bonds plainly supports this assertion: by signing the bonds, Triumph each time acknowledged that it was obligated to make certain payments according to the terms of a collective bargaining agreement with the Union.

suffices to constitute adoption of the CBAs' obligations, even had Triumph

never signed any agreement.

There is no question that an employer can be held to have adopted a

collective bargaining agreement and its attendant obligations by a course of

conduct.  *Brown* v. *C. Volante Corp.*, 194 F.3d 351, 354-56 (2d Cir. 1999).  Nor

does Triumph deny that this is so, arguing instead that applying the rule is

fact-intensive and ill-suited for summary judgment.  (Pet. Opp. 18).  It is true

that some disputes of this kind may present factual issues so extensive that

only a factfinder can resolve them.  Triumph cannot, however, contend that

summary judgment is simply unavailable; numerous cases in this District and

Circuit show just the opposite.  *See, e.g.*, *C. Volante*, 194 F.3d at 354-56

(upholding district court grant of summary judgment of liability for unpaid

fringe benefit contributions on the basis that the employer had adopted the

CBA).  Summary judgment may issue in a case with this posture.  And given

the lengthy course of conduct outlined above, summary judgment is

appropriate on this alternative basis as well: Triumph assented to its

obligations to Respondents through its actions.

Triumph's efforts to escape this conclusion are various and equally

unavailing.  Its principal response, often reiterated, is that Triumph never knew

of the terms of any CBA with the Union and so cannot be held to have adopted

obligations of which it was unaware.  (*See* Pet. Opp. 18-21, 22 n.13, 23 n.14,

24 n.16).  But as noted above, Triumph simply cannot claim that it was never

provided with or possessed knowledge of the obligations imposed on a CBA

signatory: it acknowledged, in its Petition, that it executed the 2006 CBA. (Petition ¶ 8). No matter whether it signed the interim agreements and how those agreements interacted with subsequent successor agreements executed by any employer association, Triumph at the very least had notice of the terms of the 2006 CBA and the obligations incumbent upon it as an employer of Union workers. By continuing to act in accordance with those requirements, Triumph adopted them as binding obligations.

Triumph's other attempts to deny the consequences of its course of conduct all fail as well. For example, Triumph insists that its unbroken pattern of paying Union workers exactly in accordance with rate sheets published by the Union is meaningless: "[f]or conduct such as wage payments to be a factor in considering adoption of a CBA, the payment must be referable to the CBA, as opposed to some other explanation." (Pet. Opp. 22). Paying workers in accordance with Union rates was not done in reference to any CBA, Triumph argues, because Triumph never knew anything about any CBA. (*Id.* at 18-19). In contrast, Triumph claims to have paid those rates because New York Labor Law § 220 requires employers to pay the "prevailing wage," which, when more than 30% of the workers are unionized, is identical to the union rate for that area. (Gardner Decl. ¶¶ 12.a, 12.i). This argument is defective in several ways. First, Triumph confessedly had notice of the terms of the Union's CBA. (Petition ¶ 8). Second, Triumph made no attempt to prove that its work

falls within the category that Labor Law § 220 affects.[10]  And, finally, even disregarding those problems, Triumph's legal claim, made in an attorney declaration with no evidentiary support, cannot alter the effect of Triumph's extended and deliberate assumption of the CBAs' obligations.  It remains true, as Triumph expressly acknowledges, that it paid wages and benefit contributions for Union members it employed exactly in accordance with the rates provided by the Union itself.  (Cuzzi Decl. ¶ 5).

Nor is it significant that Triumph paid benefits to the Funds using forms of its own composition, as opposed to forms the Funds composed themselves. Had Triumph used, as is apparently sometimes the case, forms requiring the employer to attest, each time it paid benefits, that it was bound by the terms of a CBA, Triumph would be even more incontestably committed to the obligations of a union employer here.  The fact that it did not use such forms, however, simply has no bearing at all on this question.  It is true that beginning in October 2013, Triumph began making payments using an electronic transfer program called I-Remit that requires Triumph to certify with each payment that is bound to the obligations common to all employers who make benefit payments.  (Powers Decl. ¶ 8; Resp. Br. 21; Pet. Opp. 22 n.12). Triumph points out that this practice began after this action began.  (Pet.

---

[10]    For example, Triumph has not shown that its work exclusively falls into the category governed by § 220: "New York's prevailing wage requirement applies only to work performed in the construction, maintenance, and repair of public buildings."  *Ramos* v. *SimplexGrinnell LP*, 796 F. Supp. 2d 346, 367 (E.D.N.Y. 2011).  Nor did Triumph offer any proof that unionized workers "comprise at least 30% of the labor force" of the relevant population for Triumph, as § 220 requires.  *Leed Indus. Inc.* v. *New York State Dep't of Labor*, No. 09 Civ. 9456 (JSR), 2010 WL 882992, at *1 (S.D.N.Y. Mar. 8, 2010).

Opp. 22 n.12).  Yet if anything, this makes Triumph's new practice even more irreconcilable with its position here: Triumph, while actively litigating a case in federal court in which it claims to have no obligations whatsoever to the Union and the Funds, began for the first time making payments via a method that requires express acceptance of those very commitments.  If Triumph truly believes that it is free from any binding obligations to Respondents, it surely would have noted some reservations or made some objection to this requirement.  Yet if Triumph has ever made such an objection, it failed to advise the Court.

This reticence is all the more odd given that Triumph now relies on the fact that it has consistently objected to arbitrating the underlying dispute over the Funds' sought audit of its papers.  (Pet. Opp. 21).  But objecting to a single procedure Triumph dislikes hardly amounts, as Triumph intimates, to a pattern of explicitly repudiating any CBA obligations to Respondents.

Even if it were otherwise, Triumph's wage and benefits payments were, if anything, the least significant of Triumph's many acts over many years demonstrating its assent to its obligations to Respondents.  Triumph has also expressly accepted its obligations via posting two surety bonds that bound Triumph to its CBA commitments.  (Powers Decl. Ex. I).  Just as with the I-Remit system discussed above, the second such bond was executed well after this litigation began.  (Resp. 56.1(a) ¶ 29; Pet. 56.1(b) ¶ 29).  Triumph thus asks the Court to accept that it launched this lawsuit to vindicate its sincere, longstanding belief that it had never entered into any agreement with the

29

Union at all — and months later executed a bond, signed by its principal, in which it swore that it was obligated to make certain payments pursuant to the terms of a CBA.

More than this, Triumph twice permitted the Funds to conduct an audit of its financial records and, on a prior occasion, to present a bill for unpaid wages and benefits.[11]  This would have constituted a profound invasion of Triumph's conduct of its affairs by a third party to whom Triumph contends now it owed no duties whatsoever.  Triumph offers no explanation at all for why it would have permitted auditors employed by another entity — a perfect stranger, in a legal sense — to examine its records and demand payment if Triumph had no obligation to do so.  The same is true for Triumph's ongoing participation in the Union's grievance procedure.  Triumph insists any settlements it made of the Union's grievances were simple financial calculations, designed to save the cost of fighting grieved claims, and that Triumph refused to participate in grievances regarding any alleged obligations other than wage and benefit payments.  No evidence is offered for the latter claim and the Court appropriately disregards it.  The former claim is irrelevant whether true or false.  The cost-benefit calculus of settlement is, of course, also at play when parties choose whether to settle or litigate disputes in court; yet a party's choice to settle or litigate would have no bearing on whether that party was subject to the court's jurisdiction.  On the other hand, the fact that

---

[11]     It is disputed, albeit not materially for the Court's disposition of these motions, whether Triumph actually paid those alleged owed sums.  (Resp. 56.1(a) ¶ 27; Pet. 56.1(b) ¶ 27).

Triumph accepted the Union's grievances and resolved them via in-person meetings between Union personnel and Triumph's principal is very meaningful indeed.  Just as with Triumph's willing submission to the Funds' multiple audit demands, this conduct would be utterly bizarre if Triumph indeed believed throughout the last decade that it had no binding obligations of any kind to the Union or the Funds.

Whether Triumph truly believed what it now contends, however, is not for the Court to decide on summary judgment.  These motions dispute a simpler claim: did Triumph's conduct constitute an adoption of the CBAs' terms, such that it cannot now evade an obligation it finds distasteful?  The answer must be yes.  Even if it never assented to either Interim Agreement, it was not free of commitments to Respondents: it bound itself by its actions. And it cannot now escape the requirement to arbitrate this dispute over the allegedly incomplete audit of its records.

### 3.  Respondents May Also Arbitrate the Alleged Delinquency

As noted above, Respondents allege a delinquency in contributions in the amount of more than $2 million.  Respondents also acknowledge that this amount has no basis in fact: it is the result of a calculation method adopted by the Funds' Trustees.  However, the invented nature of this delinquency claim does not doom it, as Triumph does not and cannot argue that the Trustees are prohibited from adopting any regulation that does not conflict with the Trust Agreements to further the collection of contributions.  (Trust Agreement 19).

Triumph argues that, while a dispute over an audit of an employer's records by the Funds may only be arbitrated, the Trust Agreements specifically indicate that the Funds may pursue delinquent contributions only via litigation.  (Pet. Br. 22-23).  Triumph is correct.  (Trust Agreements 24 ("Any matter involved in or arising under this Trust Agreement shall not be subject to the grievance or arbitration procedure … provided that the collection or provision of records relating to Contributions … shall be subject to the grievance or arbitration procedure established by any collective bargaining agreement.").  However, as the Funds point out in opposition to Triumph's motion for summary judgment — and as Triumph does not attempt to rebut in its reply brief — the Union is also a party to this dispute, and the Union may arbitrate the issue of delinquent contributions.

The Trust Agreements specifically indicate that the requirement of litigating disputes arising under the Trust Agreements (with the exception of disputes related to records) does not apply to parties to the underlying CBAs.  (Trust Agreements 24 ("[T]his provision shall not affect the rights and liabilities of any parties to those collective bargaining agreements.")).  As another court in this District held, "the [Funds] here could have sought [their] remedy [for alleged delinquent contributions] through judicial proceedings.  However, the [Funds] opted to join the [Union] in bringing this dispute before an arbitrator.... Because the [Union] is a party to the arbitration, we need not determine whether this Agreement manifests an intent to require arbitration of disputes solely between [benefit funds] and employers."  *Mic-Ron Gen. Contractors, Inc.* v.

32

*Trustees of New York City Dist. Council of Carpenters Ben. Funds*, 908 F. Supp. 208, 214 (S.D.N.Y. 1995); *see also MI Installers & Furniture Serv., Inc.* v. *New York City Dist. Council of Carpenters Pension Fund*, 476 F. Supp. 2d 387, 393 n.5 (S.D.N.Y. 2007) (citing *Mic-Ron* and noting that benefit funds could arbitrate allegedly delinquent contributions if "the Benefit Funds joined an arbitration proceeding initiated by the Union or one brought in tandem by the Union and the Benefit Funds").

Triumph cannot argue that the Union is precluded from prosecuting the issue of allegedly delinquent contributions through arbitration.  (2006 CBA 21-23; 2011 GCA 36-37).  Because the Union is present here, arbitration of this issue may proceed and the Funds may participate in it.

### 4. Triumph's Res Judicata Defense Is an Issue for the Arbitrator, Not the Court

Triumph argues that the Stipulation in the prior federal action is entitled to res judicata effect and is preclusive of Respondents' sought arbitration.  (Pet. Br. 14-16).  This argument may only be properly considered by the arbitrator, not by the Court, and the Court will not entertain it.

A defense relying on res judicata or, as it is often termed in more recent legal writing, claim preclusion, is a legal defense like waiver, estoppel, or laches; such substantive defenses are properly reserved for the arbitrator.  The Second Circuit has held that this is true when the purported preclusion arises from past litigation.[12]  *U.S. Fire Ins. Co.* v. *Nat'l Gypsum Co.*, 101 F.3d 813, 816

---

[12]     Triumph asserts in a footnote, with no support, that New York law should apply to determine the effect of the Stipulation on this federal-question action to compel

(2d Cir. 1996) ("[I]ssue preclusion, like other defenses to arbitrability, is arbitrable, and, because issue preclusion can be arbitrated, it must be arbitrated."). It has done the same when preclusion arguably attaches due to a past arbitration. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* v. *Belco Petroleum Corp.*, 88 F.3d 129, 135-36 (2d Cir. 1996) ("[A] claim of preclusion is a legal defense.... As such, it is itself a component of the dispute on the merits.... It is as much related to the merits as such affirmative defenses as a time limit in the arbitration agreement or laches, which are assigned to an arbitrator...."); *see also Transit Mix Concrete Corp.* v. *Local Union No. 282, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 809 F.2d 963, 969 (2d Cir. 1987) (holding that "the res judicata effect of the [past arbitral] award ... [is] assigned, at least in the first instance, to the" arbitral authority). The same is true when preclusion putatively arises from a past settlement. *Emilio* v. *Sprint Spectrum L.P.*, No. 08 Civ. 7147 (BSJ), 2008 WL 4865050, at *1-

---

arbitration pursuant to the Labor Management Relations Act. Oddly, Triumph nonetheless cites decisions of the federal courts throughout its moving papers and its reply brief on this very topic. (Pet. Br. 15, Pet. Reply 1). Triumph apparently does not even believe its own argument, which is in any event legally untenable.

Section 301 of the LMRA "does more than confer jurisdiction" and is a source of federal "substantive law." *Textile Workers Union* v. *Lincoln Mills*, 353 U.S. 448, 455, 456 (1957). "[L]abor-contract disputes [are required to] be resolved by reference to federal law...." *Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 202, 211 (1985). The same holds true under the Federal Arbitration Act. *Graphic Scanning Corp.* v. *Yampol*, 850 F.2d 131, 133 (2d Cir. 1988) (holding that "federal law applies to ... question[s] of arbitrability," including legal defenses like waiver). Though the FAA does not apply of its own force in this area, the body of law that has evolved under the FAA's auspices provides "guidance" to courts in arbitration cases arising from collective bargaining agreements. *Coca-Cola Bottling Co. of New York, Inc.* v. *Soft Drink & Brewery Workers Union Local 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 54 (2d Cir. 2001). Whether Respondents are now barred by claim preclusion from arbitrating their claims pursuant to a collective bargaining agreement is unquestionably an issue of federal law.

2 (S.D.N.Y. Nov. 6, 2008) (holding that both "issue-preclusion" and "claim-preclusion, or res judicata" are properly reserved for arbitration because "the interpretation of a [past class action settlement's] preclusive effect" "is a merit-based defense to arbitration"), *vacated in part on other grounds*, No. 08 Civ. 7147 (BSJ), 2008 WL 4865182 (S.D.N.Y. Nov. 6, 2008), *aff'd*, 315 F. App'x 322 (2d Cir. 2009) (summary order).

It makes no difference that Triumph here relies on a past stipulation of discontinuance (as opposed to a judgment or settlement) to argue claim preclusion as a bar to the arbitration Respondents seek to conduct.  Triumph insists that the stipulation at issue was a resolution "on the merits."  (Def. Br. 2).[13]  Such a contention, however, is surprising: Triumph can hardly contend that the Stipulation was a merits-based disposition on the one hand in an effort to preclude Respondents, while on the other hand arguing that the Stipulation is inadequately formal or merits-based to invoke arbitrability of its effect.  Nor would such an argument be successful even if not hamstrung by other of Triumph's arguments.  For example, the class-action settlement whose preclusive effect Judge Jones reserved for the arbitrators in *Sprint Spectrum* is no more the result of final court action than the stipulation at issue here. 2008 WL 4865050, at *1-2.  And Triumph itself refers to the Stipulation as the result of a "prior settlement" of the issues now fought here.  (Pet. Br. 14).

---

[13]    Precisely because the validity of this argument is left for the arbitrator to determine, the Court takes no position regarding its merits.

Finally and most conclusively, the cases cited above did not uphold the arbitrability of claim-preclusion arguments because of the specific procedural character of the allegedly preclusive past action; preclusion itself, like other affirmative defenses, is left to an arbitrator's judgment because of the substantive content of the argument. Triumph argues on reply that claim preclusion is somehow substantively different from other defenses to arbitrability that are reserved to arbitration. It is not. Not only have courts routinely held otherwise, but there is no principled categorical distinction to be drawn between different affirmative defenses going to the substance of the dispute: all must be left for the arbitrator to decide. *See N. River Ins. Co.* v. *Allstate Ins. Co.*, 866 F. Supp. 123, 129 (S.D.N.Y. 1994) (collecting cases).

Triumph cites a case in this District reaching a different result. *Nat'l Shipping & Trading Corp.* v. *Buck Shipping Int'l Ltd. of Bermuda*, No. 81 Civ. 3818 (CSH), 1985 WL 495, at *1 (S.D.N.Y. Apr. 3, 1985) ("[A]n asserted res judicata bar is appropriate for consideration by the court in a motion to compel (or to stay) arbitration.").[14] And, to be sure, several other cases from this District do the same. *See, e.g., Hatzlachh Supply, Inc.* v. *Moishe's Electronics Inc.*, 848 F. Supp. 25, 28-29 (S.D.N.Y. 1994); *Burmah Oil Tankers, Ltd.* v. *Trisun Tankers, Ltd.*, 687 F. Supp. 897, 899 & n.14 (S.D.N.Y. 1988); *Ank Shipping Co.*

---

[14]    It bears noting that the author of this opinion reversed course in a subsequent opinion. *See Enterprises Ass'n Metal Trades Branch Local Union 638, AFL-CIO* v. *Empire Mech., Inc.*, No. 91 Civ. 5014 (CSH), 1992 WL 84689, at *2 (S.D.N.Y. Apr. 9, 1992) (holding that "application of res judicata" was reserved "for the arbitrators at the hearing," and that "[a]ffirmative defenses affecting the merits of an arbitrable claim are decided by arbitrators, not the courts … in the context of a petition to compel arbitration").

*of Greece* v. *Seychelles Nat. Commodity Co., Ltd.*, 596 F. Supp. 1455, 1458-59 (S.D.N.Y. 1984).

Each of these cases adduces this proposition from *Sprague & Rhodes Commodity Corp.* v. *Instituto Mexicano Del Cafe*, 566 F.2d 861 (2d Cir. 1977). Unlike the district court cases cited in the preceding paragraph, *Sprague & Rhodes* would bind this Court were it to the contrary; however, this authority is much less helpful to Triumph than subsequent citations to it might suggest. In *Sprague & Rhodes*, the Second Circuit considered an appeal from a denial of a motion to compel arbitration. *Id.* at 862. The district court denied the petition on the basis that no written agreement existed between the parties. *Id.* After the district court's decision and while the case was pending on appeal, a court in Mexico granted a default judgment against the petitioner on a claim that the respondent alleged was identical to the claim the petitioner sought to arbitrate in the United States. *Id.* The respondent sought affirmance from the Second Circuit on the grounds that the arbitration was now barred by claim preclusion; the petitioner, in turn, insisted it had never appeared in the Mexican dispute and so was not subject to the Mexican court's jurisdiction. *Id.*

*Sprague & Rhodes* thus confronted facts radically different from those here. The Second Circuit, lacking the benefit of any legal or factual development below, was confronted with a foreign judgment whose content it did not understand and a jurisdictional dispute based only on conclusory allegations, in the context of unfamiliar Mexican civil procedure and overlain by the strong policy of international comity that militates towards giving domestic

37

effect to the judgments of foreign courts. *See North River Ins. Co.*, 866 F. Supp. at 130 (suggesting that the rationale for *Sprague & Rhodes* derives from a commitment to respecting the judgments of foreign courts). It is unsurprising that the Second Circuit directed the district court, given these extraordinary post-decision complexities, to take up the dispute again and develop the record. Moreover, no binding legal ruling issued in *Sprague & Rhodes*; on the contrary, the panel couched its order in speculative and conditional terms: "*If* the Mexican court had jurisdiction, its adjudication of the merits *may* affect any decision to compel arbitration." 566 F.2d at 862 (emphases added).

Notably, in *U.S. Fire Ins. Co.*, 101 F.3d 813, the appellees cited *Sprague & Rhodes* to the Second Circuit in support of the proposition that a court, not an arbitrator, should decide claims of collateral estoppel in the face of a petition to compel arbitration. Brief for Appellees at 16, *U.S. Fire Ins. Co.*, 101 F.3d 813 (No. 95-7806), 1996 WL 33471359 (filed Apr. 15, 1996). Yet the Second Circuit ruled nonetheless in that case that "issue preclusion, like other defenses to arbitrability, is arbitrable, and, because issue preclusion can be arbitrated, it must be arbitrated." *U.S. Fire Ins. Co.*, 101 F.3d at 816; *see also Sprint Spectrum*, 2008 WL 4865050, at *2 ("[R]egardless of [whether it is issue or claim] preclusion at issue, the relevant comparison is that both cases involve the interpretation of a judgment's preclusive effect."). The Second Circuit has very recently cited *U.S. Fire Insurance* in the course of holding yet again that "arbitrators possess authority to apply collateral estoppel based on prior judicial or administrative decisions." *Am. Postal Workers Union, AFL-CIO* v. *U.S.*

*Postal Serv.*, No. 13-2579-cv, — F. 3d. —, 2014 WL 2535249, at *4 (2d Cir. June 6, 2014).

In short, *Sprague & Rhodes* simply cannot be read for the broad proposition Triumph suggests, and the Court joins the numerous courts in this District reaching the contrary result.[15]  *See, e.g., Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*, No. 13 Civ. 6073 (PKC), 2013 WL 6171315, at *4 (S.D.N.Y. Nov. 25, 2013) (holding that "preclusion is a merits-based defense to be decided by arbitrators"); *Pontier* v. *U.H.O. Mgmt. Corp.*, No. 10 Civ. 8828 (RMB), 2011 WL 1346801, at *3 (S.D.N.Y. Apr. 1, 2011) ("Matters reaching the merits of the dispute — including Defendants' res judicata argument raised in its Fed. R. Civ. P. 12(b)(6) motion — are to be resolved by the arbitrator."); *In re New Jersey Boom & Erectors, Inc.*, No. 00 Civ. 7812 (RLC), 2001 WL 357087, at *1 (S.D.N.Y. Apr. 9, 2001) ("[M]atters reaching the merits of the dispute — including [a] res judicata argument … — are to be resolved by the arbitrator).

### 5. Whether Respondents Failed to Comply with Conditions Precedent to Arbitration Is a Question for the Arbitrator

Triumph, pointing to Article V, Section 2 of the 2006 CBA, argues that Respondents failed to comply with numerous conditions precedent to

---

[15]     It is worth noting that this result comports with the general rule of profound deference accorded to arbitration agreements by the courts.  "[I]t is difficult to overstate the strong federal policy in favor of arbitration," *Arciniaga* v. *Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.* v. *Mercury Const. Corp.*, 460 U.S. 1, 24-26 (1983), especially in the context of labor disputes, *United Steelworkers of Am.* v. *Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (1960).

arbitration and, for this reason, should be precluded from arbitrating this dispute.[16]  Just as with the claim preclusion argument discussed above, this is a substantive defense to arbitration that the arbitrator must decide for the same reasons he must decide whether the stipulation precludes Respondents from arbitrating this dispute now.  "'[W]hether prerequisites such as time limits, notice, laches, estoppel and other *conditions precedent* to an obligation to arbitrate have been met, are for the arbitrators to decide.'"  *Oltchim, S.A.* v. *Velco Chemicals, Inc.*, 348 F. Supp. 2d 97, 100 (S.D.N.Y. 2004) (quoting *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002)) (emphasis added).[17]

### 6.   Attorneys' Fees Will Be Awarded

The Court has already determined that Triumph is bound by the 2006 CBA and its successor GCA agreements.  The collective bargaining agreements, in turn, incorporate by reference and bind Triumph to the Trust Agreements that govern the structure and operation of the Funds.  (2006 CBA 24; 2011 GCA CBA 28).  The Trust Agreements themselves empower the Funds' Trustees

---

[16]   Notably, Triumph provides no factual allegations to support this argument.  Triumph's Petition does include certain allegations that Respondents failed to comply with procedural requirements before filing a Notice of Intent to Arbitrate.  (Petition ¶¶ 52-56).  Unlike Triumph's judicial admissions of its own past actions discussed above (Petition ¶ 8), allegations made in a pleading about the conduct of another party cannot possibly provide sufficient basis for a grant of summary judgment.  Even if the Court could consider this claim, it would have to deny summary judgment on this issue, as there is no adequate evidence in this record to determine what, if anything, Respondents did in advance of arbitration.  However, as this is an argument reserved for the arbitrator's assessment, the Court offers no judgment on its merits.

[17]   Triumph cites a single New York State court case for the opposite rule, that the court and not the arbitrator should make this determination.  For the reasons set out above in note 12, the Court applies federal law.

to promulgate rules and regulations necessary to effect the purposes of the Funds' Trust Agreements.  (Trust Agreement 19).  The Trustees, under this authority, established a procedure governing collection of owed benefits (the "Collection Policy").  The Collection Policy specifies that an employer who resists the Funds' efforts to conduct an audit of its records "shall be assessed all costs and attorneys' fees incurred as a result of the employer's refusal to permit the ... audit...."  (Collection Policy 12).  Respondents demand, pursuant to these agreements, that Triumph pay the fees and costs Respondents have incurred in connection with this litigation.

Triumph makes a number of futile arguments in response, including that it was never a party to any agreement; that Respondents have no right to the arbitration because Triumph never agreed to arbitrate; and that Respondents are precluded from arbitrating.  (Pet. Opp. 25).  The Court has already rejected each of these arguments (or, in the case of the last, determined that it is appropriately for the arbitrator to decide) and they receive no different treatment here.

Triumph offers one additional argument that has merit.  The Collection Policy provides as follows: "If necessary, the Funds[] ... shall institute legal action to enforce the Trustees' right to conduct the ... audit and the employer shall be assessed all costs and attorneys' fees incurred as a result of the employer's refusal to permit the ... audit...."  (Collection Policy 12).  Triumph argues that this should be read to authorize attorneys' fees in connection with court action only when Respondents themselves initiate that court action.

41

Because Triumph, not Respondents, "institute[d]" the court action at issue in state court before Respondents removed it here, Triumph contends that this provision is inapplicable.

Though colorable, Triumph's argument fails on the text of the Collection Policy. The provision plainly contains two separate clauses: the first authorizes the Funds to institute legal action if necessary to conduct an audit; the second authorizes the Funds to collect "all costs and attorneys' fees incurred as a result of the employer's refusal to permit the … audit" — irrespective of the posture in which those costs were incurred. (Collection Policy 12). For Triumph's reading to be correct, the provision would have to indicate that the costs in question were authorized for collection only when related to action undertaken by Respondents. If the Collection Policy read, for example, "if necessary, the Funds shall institute legal action to enforce the Trustees' right to conduct the audit and the employer shall be assessed all costs and attorneys' fees incurred as a result of *such legal action*," Triumph's argument might have merit. But the Correction Policy was not written that way.

More to the point, even if the provision in question were construed as Triumph argues, Triumph would still lose. Triumph's reading assumes that the phrase "legal action" is merely a stand-in for the term "litigation." The Collection Policy evinces a different meaning. For example, in the distinct but analogous context of seeking payment for delinquencies, the Collection Policy explains that the Funds' counsel "shall initiate legal action by sending … a Notice of Intent to Arbitrate…. Legal action to collect delinquencies shall

generally be in the form of arbitration.…   Legal action in the form of arbitration
(or … a lawsuit in court) shall be initiated and litigated to conclusion.…"
(Collection Policy 15).  This provision plainly illustrates that "lawsuit" and
"arbitration" are, for the purposes of the Collection Policy, two different
varieties of actions belonging to the larger set of mechanisms termed "legal
action" that the Funds may pursue to enforce employer obligations.  (*See also
id.* at 14 ("lawsuit, arbitration, or *other legal action*"); *id.* ("[a]ll recoverable costs
actually incurred in court or *other legal actions*")).  In short, Respondents did
initiate action, such that Triumph's reading of the relevant provision, even if
correct — which, as the Court has already explained, it is not — would be
satisfied.

Under any fair reading of the relevant provision, Respondents are entitled
to attorneys' fees in connection with this action.

**CONCLUSION**

For the reasons set forth above, Respondents' motion is GRANTED and Petitioner's motion is DENIED.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 19 and 28.

It is further ORDERED that, by no later than July 30, 2014, Respondents shall submit a fee application to the Court, including a sworn declaration providing each attorney's background, experience, and billing rate at the time the work was expended, as well as copies of the attorneys' time sheets.  Petitioner may submit papers opposing the amount of fees requested, but not the imposition of fees themselves, by no later than August 27, 2014.

SO ORDERED.

Dated:      July 3, 2014
            New York, New York

_____
   KATHERINE POLK FAILLA
   United States District Judge

44